## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-00354-APM** |
| **THOMAS B. ADAMS, JR.,** | |
| **Defendant.** | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Thomas B. Adams, Jr. to 34 months' imprisonment, the midpoint of the Guidelines range of 30 to 37 months, three years of supervised release, $2,000 in restitution, and a mandatory special assessment of $200.

### I.    INTRODUCTION

The defendant, Thomas B. Adams, Jr., participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Adams was one of the first rioters to enter the Capitol through the Parliamentarian Door.

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

1

After entering, Adams ignored and walked past a line of U.S. Capitol Police just beyond the Parliamentarian Door who were attempting to stop the rioters. Once Adams moved past the line of officers, he made his way into the Senate Chamber. Adams walked into to the Senate well, where he and several other rioters walked among the Senators' desks. While on the Senate floor, Adams took multiple photos with his cellphone. Police escorted Adams out of the Capitol Building via the Senate Carriage Door. He was inside the Capitol building for approximately 23 minutes.

The government recommends that the Court sentence Adams to 34 months' incarceration on his convictions for violating 18 U.S.C. §§ 1512(c)(2) and 2 and 18 U.S.C. §1752(a)(1), which is within the advisory Guidelines' range of 30 to 37 months, which the government submits is the correct Guidelines calculation. A 34-month sentence reflects the gravity of Adams' conduct and his persistent lack of remorse, even two years after the events of January 6.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021, Attack on the Capitol

The government refers the court to the Statement of Facts for Stipulated Trial filed in this case, ECF No. 49, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.    Adams' Role in the January 6, 2021, Attack on the Capitol

*Planning for January 6*

Adams and Roy Nelson Franklin[2] drove from Springfield, Illinois, to Washington, D.C., to attend what Adams understood to be "Trump's Last Stand Rally" on January 6, 2021, and a "peaceful occupy." They packed bags of clothes and a tent because they did not know how long they would be there. They left Springfield, driving, on January 4 and arrived in D.C. on January 5.

*Approach to the Capitol*

On January 6, Adams and Franklin attended the "Stop the Steal" rally near the Washington Monument. They then marched to the Capitol via Constitution Avenue and Pennsylvania Avenue, ending up at the Peace Monument on Capitol grounds. From the Peace Monument, rioters flooded the western lawn of the Capitol building. The rioters breached the police line guarding the Upper West Terrace stairs at approximately 2:09 p.m., by physically pushing past the police. Adams and Franklin were in the stream of rioters that followed that initial breach, rushing up the stairs at approximately 2:26 p.m., as captured in Image 1.

---

[2] Franklin is charged with conduct related to January 6 under 22-cr-140 (JEB). That case is still pending.



Image 1: Still image from Capitol surveillance video capturing Adams on the Upper West Terrace stairs at approximately 2:26 p.m.

After ascending these stairs, the rioters, including Adams and Franklin, amassed outside the Parliamentarian Door on the Upper West Terrace. The Parliamentarian Door is a fire door that is not a usual point of ingress or egress. Adams and Franklin were on the Upper West Terrace for approximately 27 minutes before entering the Capitol building. During that time, rioters chanted "USA! USA!" in a video that Adams recorded, (*see* Exhibit 1 at timestamp 2:25), and "Stop the steal!" in a video that another rioter recorded (*see* Exhibit 2 at timestamp 0:15) that captures Adams seconds later (*see id.* at timestamp 0:20, in the lower left-hand corner).

***Entry into Capitol Building***

Rioters breached the Parliamentarian Door at approximately 2:42 p.m. by breaking a glass pane in the door, reaching in to unlock the door, and rushing past the United States Capitol Police (USCP) officers who were at the door and overwhelmed by the number of rioters. Adams and Franklin entered with this initial rush of rioters at approximately 2:48:21 p.m., as captured in Image 2.

4



Image 2: Still image from Capitol surveillance video capturing Adams entering the Capitol building through the Parliamentarian Door at approximately 2:48:21 p.m.

After entering, Adams and Franklin walked north toward the North Door Appointment Desk, which they reached at approximately 2:58 p.m. There, they encountered a line of USCP officers who were who were attempting to stop the rioters. Adams recorded a portion of this encounter. *See* Exhibit 3 at timestamp 1:12-2:25. Rioters yelled at the police, "We're the 3%!", "We fear our country being taken over by communists!", and "Join us!", and chanted, "Do what's right!"

After Adams' recording ended, a USCP officer pushed a rioter who was standing beside Adams. A wall obstructs the view of what occurred after the push, but it appears that Adams intervened on behalf of the other rioter, and grabbed a hold of the officer until another rioter and another officer separated Adams and the initial officer. The struggle lasted approximately 15 seconds, *See* Image 3 and Exhibit 4, USCP Capitol surveillance video, which shows Adams during that altercation with the officer from 2:58:37 p.m. to 2:58:42 p.m.

5



Image 3: Still image from Capitol surveillance video capturing Adams struggling with a USCP officer at 2:58:37 p.m.

Following this altercation, the police gestured to the rioters to stop, but by 3:01 p.m., Adams and the rioters overwhelmed the police line and moved further into the building. *See* Image 4 and Exhibit 4 at from 3:01:00 p.m. to 3:01:25 p.m.



Image 4: Still image from Capitol surveillance video capturing Adams pushing past the police line at 3:01:21 p.m.

6

Once Adams made his way past the line of officers, he went upstairs, toward the Senate Chamber, passing by Vice President Pence's ceremonial office at approximately 3:02:05 p.m., as captured in Image 5.



Image 5: Still image from Capitol surveillance video capturing Adams passing by the Vice President's ceremonial office at 3:02:05 p.m.

***Entry onto Senate Floor***

At approximately 3:04:16 p.m., Adams entered the Senate Chamber through a door on the second floor, as captured in Image 6.



Image 6: Still image from Senate surveillance video capturing Adams entering the Senate floor at 3:04:16 p.m.

Adams walked into to the Senate Well, where he and multiple other rioters walked among the Senators' desks. While on the Senate floor, Adams recorded the scene with his cellphone, as captured in Image 7, and cheered and held up a "Stop the Steal" sign as he approached the dais, as captured in Image 8. Adams was standing directly next to the table where the Electoral Ballot boxes had been placed earlier in the day, as depicted in Image 9.



Image 7: Still image from Senate surveillance video capturing Adams using his cellphone to record while on the Senate floor at 3:04:46 p.m.



Image 8: Still image from Senate surveillance video capturing Adams cheering and holding up a "Stop the Steal" sign in front of the dais on the Senate Floor at 3:06:50 p.m.



Image 9: Electoral College ballot boxes on the Senate Floor.

At approximately 3:07 p.m., officers from the Metropolitan Police Department (MPD) entered the Senate Floor and began the process of ejecting the rioters. Adams exited the Senate at approximately 3:09:15 p.m. and went downstairs to the first floor at the direction of police. Officers escorted Adams out of the Capitol building at 3:11 p.m., as captured in Image 10.



Image 10: Still image from Capitol surveillance video capturing police escorting Adams out of the Capitol building at 3:11:00 p.m.

### *Adams' Statement to the FBI*

On February 4, 2021, Adams told the FBI that other people had breached the door with "window washing equipment." He also stated that he walked into the Capitol Building over broken glass, and that one of the doors through which he entered had a broken window.

Adams said that he and Franklin traveled to Washington, D.C., intending to occupy the Capitol building. He stated, in substance, "We did not have a specific plan and grabbed a couple bags of clothes and a tent. The only preparation we were concerned about was potentially being outside for a while. Since we were planning to occupy, we didn't know if they were going to be out there for one day, five days, or a week." Additionally, he stated that he did not want a "pedophile" running this country. He further explained that while he was inside the Capitol and observed how many people were present, he thought to himself, "What are they going to do if half a million people are here and standing inside of a building and want to be heard? He stated that he believed the situation inside the Capitol escalated because "some people are just ignorant." He

described exiting the Capitol as being "forced out."

### III.    THE CHARGES

On May 12, 2021, a federal grand jury returned an indictment charging Adams with the following five counts: 18 U.S.C. §§ 1512(c)(2) and 2, 18 U.S.C. §1752(a)(1), 18 U.S.C. §1752(a)(2), 40 U.S.C. §5104(e)(2)(D), and 40 U.S.C. §5104(e)(2)(G).

On January 30, 2023, Adams was convicted of 18 U.S.C. §§ 1512(c)(2) and 2 and 18 U.S.C. §1752(a)(1) as the result of a stipulated trial.

### IV.    STATUTORY PENALTIES

Adams now faces sentencing on 18 U.S.C. §§ 1512(c)(2) and 2 and 18 U.S.C. §1752(a)(1).

As noted by the Presentence Report issued by the U.S. Probation Office (ECF No. 64), Adams faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100 on his conviction on 18 U.S.C. §§ 1512(c)(2) and 2, and a term of imprisonment of not more than one year, a term of supervised release of not more than one year,  a fine up to $100,000, and a mandatory special assessment of $25 on his conviction on 18 U.S.C. §1752(a)(1).

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government's Guidelines analysis is as follows:

**Count One: 18 U.S.C. § 1512(c)(2) and § 2—Attempted to and Aided and Abetted the Obstruction of an Official Proceeding before Congress[3]**

| Base offense level: | 14 | U.S.S.G. § 2J1.2(a) Obstruction |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice." This enhancement has been applied to all January 6 defendants convicted of violation of Section 1512(c)(2). The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted while legislators were physically evacuated for their own safety. |
| Total | 17 | |

**Count Two: 18 U.S.C. § 1752(a)(1) —Entered and Remained in a Restricted Building**

| Base offense level: | 4 | U.S.S.G. § 2B2.3(a) |
|---|---|---|
| Specific Offense Characteristic | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds."<br><br>On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Cross Reference | | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply § 2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |
| Base Offense Level (adjusted) | 17 (from Count One) | U.S.S.G. § 2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."<br><br>Adams entered the restricted area of the Capitol Building and Grounds for the purpose of obstructing the official proceeding—that is, stopping Congress from doing its work. The substantive offense is thus Count One, and the base offense level for that offense should be applied. |
| Total | 17 | |

---

[3] Paragraphs 49 through 57 of the presentence report contain a Guidelines analysis for the Section 1512(c)(2) conviction which is the same as this analysis. The PSR contains no Guidelines analysis for the Section 1752(a)(1) conviction, but as shown herein, because the two counts of conviction group, the offense level for the Section 1752(a)(1) conviction does not affect the total offense level for the two counts.

13

Under U.S.S.G. § 3D1.2, "closely related counts" group if they "involve the same victim and two or more acts or transactions connected by a common criminal objective," among other criteria for grouping. U.S.S.G. § 3D1.2(b). In general, "[a]mbiguities should be resolved in accordance with the purpose of [§ 3D1.2] as stated in the lead paragraph, i.e., to identify and group 'counts involving substantially the same harm.'" Id. n.2. Under U.S.S.G. §3D1.3(a), we then determine the offense level for a group of closely related counts, using the highest offense level of the counts in each group.

Counts One and Two both involve Congress as the victim; therefore, these counts constitute one group. The highest offense level for Adams is 17 (Count Two), which also constitutes the combined offense level for the group.

Although Adams proceeded by way of a stipulated trial, effectively admitting his guilt to the two counts of conviction, the Probation Office concluded that Adams is not entitled to any downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1. PSR ¶ 42. That conclusion was based on Adams' interview with a local newspaper on February 1, 2023, two days after the stipulated trial, in which he stated, "I wouldn't change anything I did…I didn't do anything. I still to this day, even though I had to admit guilt (in the stipulation), don't feel like I did what the charge is." PSR ¶ 42, citing www.sj-r.com/story/news/crime/2023/02/01/thomas-b-adams-jr-was-convicted-for-breaching-u-scapitol-on-jan-6/69863729007/. The Probation Office concluded that "Based upon his post-trial statements, it does not appear that the defendant has accepted responsibility for his conduct in this case, and an adjustment pursuant to USSG §3E1.1, is not warranted." *Id*.

14

The government agrees that Adams is not entitled to a downward adjustment for acceptance of responsibility.[4] Although a guilty plea coupled with "truthfully admitting or not falsely denying any additional relevant conduct" amounts to "significant evidence of acceptance of responsibility," "this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." U.S.S.G. § 3E1.1, cmt. n.3. "A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." *Id*. Adams' statement that he would not change what he did on January 6, and "*even though I had to admit guilt (in the stipulation)*, don't feel like I did what the charge is," is the opposite of acceptance of responsibility. This Court should adopt the Probation Office's recommendation and deny Adams any acceptance points. *See United States v. Taylor*, 72 F.3d 533 (7th Cir. 1995) (affirming denial of acceptance points to defendant who pleaded guilty, where the sentencing court found that defendant falsely denied her involvement in drug distribution network and sought to minimize her sentence).

As a result, Adams' adjusted offense level is 17.

The U.S. Probation Office calculated Adams' criminal history as category III. PSR ¶ 69. Accordingly, based on the government's calculation of Adams' total adjusted offense level of 17, Adams' Guidelines imprisonment range is 30 to 37 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

---

[4] In a letter to the Probation Office, the government indicated that Adams was entitled to a downward adjustment for acceptance of responsibility; however, it has changed its position upon reviewing the Probation Office's recommendation.

### A.  Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Adams' felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. After entering the Capitol building, Adams pushed past a line of police and went upstairs to enter the Senate Floor, where he recorded on his cellphone for several minutes before being ejected by police. The nature and circumstances of Adams' offenses were of the utmost seriousness, and fully support the government's recommended sentence of 34 months of imprisonment.

### B.  Adams' History and Characteristics

Adams is currently employed as a lawncare crew foreman at a company where he has worked off and on since approximately June 2015. PSR ¶ 108. Adams has a significant history of arrests and convictions which weighs in favor of a lengthy period of incarceration:

- In 2001, Adams was convicted of burglary for breaking into several vehicles and sentenced to probation and payment of restitution. PSR ¶ 60.
- In 2002, Adams was convicted of retail theft and sentenced to 2 days of imprisonment. PSR ¶ 61.
- In 2002, Adams was convicted of residential burglary for entering into a home and stealing a television and computer equipment. He was sentenced to 4 years of imprisonment, 2 years of supervised release, and payment of restitution. PSR ¶ 62.
- In 2013, Adams was convicted of unlawful possession of cannabis and was sentenced to a conditional discharge. PSR ¶ 63.
- In 2014, Adams was convicted of possession of drug paraphernalia and sentenced to 10 days of periodic imprisonment. PSR ¶ 64.
- In 2015, Adams was convicted of driving under the influence of alcohol and sentenced to 1 year of court supervision. PSR ¶ 65.
- In 2019, Adams was convicted of driving under the influence of alcohol and sentenced to 10 days of imprisonment and 24 months of conditional discharge. PSR ¶ 66. Adams committed the instant offense while under a criminal justice sentence for this conviction. PSR ¶ 68.

16

Adams' crimes on January 6 were not an isolated event in an otherwise law-abiding life. They came, instead, after a long series of offenses and weigh in favor of a lengthy term of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Adams' criminal conduct on January 6 was the epitome of disrespect for the law.

### D.  The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. In text messages that he sent on January 7, 2021, he reiterated his purpose of occupying the Capitol and insisted that he had been "peaceful" while inside, despite riot happening around him—and despite his claim that "everyone outside the capital [sic] should have been inside it once we broke through the line."

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").



Image 11: Text message Adams sent on January 7, 2021, at 6:34 p.m.



Image 12: Text message Adams sent on January 7, 2021, at 9:02 p.m.

Adams has also repeatedly minimized his conduct and that of his fellow rioters in his comments to the press on January 7, 2021, and February 1, 2023, clearly demonstrating that he continues to view his own behavior as justified.

On January 7, 2021, *Insider*, an online media company, published an article[6] entitled "Men who joined in violently storming the US Capitol describe a carnival atmosphere inside", which

---

[6] https://www.insider.com/men-who-broke-into-the-capitol-describe-a-carnival-atmosphere-2021-1

featured and heavily quoted Adams. *Insider* quoted Adams as having said, "It was a really fun time," and describing the scene as "hilarious." The article also said that Adams stated that he had been spurred on by President Trump's claim that he had been cheated out of victory.

On January 30, 2023, Adams was convicted following a stipulated bench trial of 18 U.S.C. §§ 1512(c)(2) and 2 and 18 U.S.C. §1752(a)(1). During that proceeding, the Court and Adams engaged in the following colloquy, during which Adams was under oath:

> THE COURT: And you believe these facts as they were set forth in the document that we talked about, which is the Statement of Facts for Stipulated Trial, that those facts are true and accurate, sir?
>
> THE DEFENDANT: Yes, sir, to the best of my knowledge.
>
> THE COURT: And do you agree, sir, that those facts that you have agreed to support convictions based upon beyond a reasonable doubt of Count 1, charging you with civil -- excuse me, charging you with obstruction of an official proceeding and aiding and abetting the obstruction of an official proceeding? Do you agree with that, sir?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: And Count 2, that the facts support a conviction for entering or remaining on a restricted building or grounds, sir. Do you understand that?
>
> THE DEFENDANT: Yes, sir.

(Tr. 1/30/23 at 39).

Two days later, on February 1, 2023, *The State Journal-Register* of Springfield, IL, published an article[7] entitled "'I wouldn't change anything I did' Springfield man convicted in breach of U.S. Capitol." The article quoted Adams as saying, "I wouldn't change anything I did," and "I didn't do anything. I still to this day, even though I had to admit guilt (in the stipulation), don't feel like I did what the charge is." He is also quoted as saying, "I had no criminal intent. I

---

[7] https://www.sj-r.com/story/news/crime/2023/02/01/thomas-b-adams-jr-was-convicted-for-breaching-u-s-capitol-on-jan-6/69863729007/

had no malicious intent." These statements to the press minimized his conduct on January 6 and demonstrated disrespect for the Court and the rule of law. Even two years after the fact, Adams does not regret his actions, nor the harm that he and his fellow rioters caused. As such, Adams' sentence must be sufficient to provide specific deterrence from committing future crimes.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly

considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[9]

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Jacob Chansley,* 21-cr-00003 (RCL), following a guilty plea to 18 U.S.C. § 1512(c)(2), Judge Lamberth sentenced Chansley to 41 months in prison.[10] While at the Capitol on January 6, Chansley carried a bullhorn and an American flag tied to a pole with a spear tip. On the West Plaza, he climbed a media tower erected for the upcoming Presidential

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[10] Due to Chansley's acceptance of responsibility, the court applied a three-level reduction, resulting in an adjusted offense level of 22 and a Guidelines sentencing range of 41-51 months in prison. Chansley's criminal history category was I.

inauguration. He pushed past a police line and was among the first 30 rioters to enter the Capitol when he crossed the threshold of the Senate Wing Door at 2:14 p.m., approximately one minute after rioters smashed windows and forcibly breached there.

Chansley proceeded to the second floor of the Senate Wing, where he was met by USCP officers who directed him and other rioters to exit the building. Chansley riled up other rioters with his bullhorn and demanded that lawmakers be brought out. Eventually, Chansley carried his bullhorn and makeshift spear onto the Senate Floor. He immediately proceeded to the dais and took the seat that Vice President Pence had occupied less than an hour earlier. Chansley wrote an ominous message that he left on the Vice President's desk—"ITS [*sic*] ONLY A MATTER OF TIME JUSTICE IS COMING!"—and led others in his spectacle "prayer" from the dais. Along with Adams, Chansley vacated the Chamber when the column of MPD officers arrived and exited the building. During one of the interviews he gave to media outlets after January 6, Chansley stated, "The fact that we had a bunch of our traitors in office hunker down, put on their gas masks and retreat into their underground bunker, I consider that a win."

Chansley spent about an hour inside the Capitol, compared to approximately 23 minutes for Adams, and Chansley took up a leadership role among the rioters that Adams did not. However, they both pushed past police lines and made statements to the press after January 6 that lauded the actions of the rioters.

In *United States v. Christine Priola*, 22-cr-242 (TSC), following a guilty plea to 18 U.S.C. § 1512(c)(2), Judge Chutkan sentenced Priola to 15 months in prison.[11] Priola joined the front lines

---

[11] Due to Priola's acceptance of responsibility, the court applied a three-level reduction, resulting in an adjusted offense level of 22 and a Guidelines sentencing range of 15-21 months in prison. Priola's criminal history category was I.

of the riot and entered the Capitol building soon after other rioters overcame the USCP officers guarding the East Rotunda (Columbus) doors. Priola carried a large sign reading, "WE THE PEOPLE TAKE BACK OUR COUNTRY" on one side, and "THE CHILDREN CRY OUT FOR JUSTICE" on the other side. Once in the building, Priola made her way to the Senate Floor. While on the Senate Floor, Priola spoke to an associate by telephone and encouraged that person to come inside either the Capitol building or the Senate Chamber, saying it was "now or never."

Judge Chutkan characterized the attack as an attempt to overthrow the government by people who were upset that their candidate had lost. She reiterated her reasoning that a mob is not a mob without its members. Judge Chutkan reasoned that although it was to Priola's credit that she had no criminal history and had not engaged in acts of violence or destruction, she already got the benefit of that in the government's charging decisions. She also said that Priola seemed to be enjoying herself in the videos. At the same time, Judge Chutkan said she believed Priola was sincere in her expressions of remorse.

Adams' and Priola's conduct inside the Capitol was comparable. However, Judge Chutkan credited Priola's expression of remorse and sentenced her to the bottom of her Guidelines range. Adams, in contrast, has not shown remorse. Given Adams' statements to the press, both immediately after January 6 and more recently, a sentence of 34 months' incarceration is appropriate.

In *United States v. Christopher Moynihan*, 21-cr-226 (CRC), following a conviction after a stipulated trial to 18 U.S.C. § 1512(c)(2), Judge Cooper sentenced Moynihan to 21 months in prison.[12] Moynihan was among the first rioters to enter the Capitol Grounds by breaching police

---

[12] Due to Moynihan's acceptance of responsibility, the court applied a three-level reduction,

barricades on the East Front. Moynihan climbed the east steps of the Capitol and joined the rioters outside the Rotunda Door. He watched as rioters attacked police trying to defend the door and continued to push his way forward into the building. Once inside, Moynihan marched directly to the Senate Chamber, chanting and shouting as he walked through the halls of the Capitol. While on the Senate Floor, he rifled through papers related to the certification of the Electoral College that were on a Senator's desk. Like Adams, he listened to Chansley's "prayer" and exited only when police arrived and ejected the rioters.

In imposing sentence, Judge Cooper concluded that Moynihan was an active participant in the riot, pushed his way into the Capitol, and entered the Senate Chamber itself as aggravating factors. Additionally, Moynihan rifled through a senator's papers, and lied about having gotten rid of his cellphone at the time of his arrest. However, Judge Cooper stated he credited Moynihan for not engaging in violence, organizing or leading the rioters, or carrying weapons.

Adams' conduct is similar to that of Moynihan, but it is exacerbated by the fact that Adams made statements to the press that downplayed his own conduct as well as the seriousness of the events in the Capitol as a whole on January 6 which reveal his lack remorse for his conduct.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C.

---

resulting in an adjusted offense level of 14 and a Guidelines sentencing range of 33-41 months in prison. Moynihan's criminal history category was V.

Cir. 2011). Two general restitution statutes apply here. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to only certain offenses "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), such as a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Adams was convicted of 18 U.S.C. §§ 1512(c)(2) and 2 and 18 U.S.C. §1752(a)(1), neither of which is a crime of violence nor an offense against property, the MVRA does not apply. But because Adams was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See*

*Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[13]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Adams to pay $2,000 in restitution for his convictions on Counts One and Two. This amount fairly reflects Adams' role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of

---

[13] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 34 months' imprisonment, the midpoint of the Guidelines range of 30 to 37 months, three years of supervised release, $2,000 in restitution, and a mandatory special assessment of $200.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

</div>

By:   */s/ Carolina Nevin*
      CAROLINA NEVIN
      Assistant United States Attorney
      601 D Street NW
      Washington, D.C. 20530
      NY Bar No. 5226121
      (202) 803-1612
      Carolina.Nevin@usdoj.gov

*/s/ James D. Peterson*
JAMES D. PETERSON
Special Assistant United States Attorney
United States Department of Justice
1331 F Street N.W. 6th Floor
Washington, D.C. 20530
VA Bar No. 35373
Desk: (202) 353-0796
Mobile: (202) 230-0693
James.d.peterson@usdoj.gov